Next case is Sharon Marchman v. Numerous People. I'll just leave it at that. I know you had requested more time and that was denied, but we'll be flexible about that in light of how many defendants there were in this case. Okay. You may proceed. Judge Sharon Marchman Good morning, Your Honor. Joseph Ford on behalf of Judge Sharon Marchman. First thing I wanted to talk about is what was the speech. The judge made a critical error. He looked at some things beyond the record. He looked at the transcript of a hearing in front of Judge Sharp, motion to recuse hearing, where Judge Marchman had a subpoena ducis tecum. She made a return on it. And during that conference, actually a very surreal thing that took place in the judge's courtroom, I don't know how, I don't know if I gave it or if one of my co-counsel gave it to the judge, but he had a copy of that transcript. I suspect Mr. Crawford may have attached it in numerous documents. In that conference, Judge Marchman stands up and says, Your Honor, I'm here to make a return on my subpoena. Of course, there's a long history going back a year of the court arguing about whether certain information should be made public about this law clerk. Judge Marchman, he says, well, what's that you got in your hand? And she had, she said, these are a couple of sheets of paper from the judicial administrator where she's saying she's not given many documents. There's more discussion. The district judge said, well, that's all she produced. No, read my complaint, my amended complaint. Judge Marchman gave me her entire file, the whole, her file on all the investigation the court had done regarding Ms. Campbell. And if you look at the paragraphs, I think it's paragraph 78, 60 through 78, the defendants attacked her because she gave all this privileged, allegedly privileged and confidential information. Judge Marchman doesn't deny she gave the documents in response to the subpoena, but she says that it wasn't illegal giving. I had a subpoena. The judge says, comply with the subpoena. Give it to the attorneys. So your position is the speech for purposes of Lane and Garcetti is the document production. That's part of it. That's part of it. There's some prior restraint speech where she's told she can't say certain things, but the actual speak she gives is the production of documents and the quote, the little stunt, according to Judge Marchman. But substantively, her testimony was, I'm here to make a return on my subpoena. That's correct. There's no other substantive content. There is no substantive content. So what's the best case that stands for document production equals speech? I know Lane Lane, I think Lane Lane says testimony in response to a subpoena. I don't remember if that was a subpoena deuces take them. In other words, speech equals document production. Judge, I think that you, uh, your honor, there's several cases that say a document equals speech. If you look at Charles, you look at some other cases, somebody just sends an email. Someone writes a letter. She, but in the context of Lane and Garcetti citizen speech, what's your best case that says document production equals speech? I think it's got to be Lane. Okay. You don't know of any other case. I could not even if you're right, that this was her retaliatory action subsequent to that courtroom moment. Well, right off the bat, uh, judge sharp within a week or two. No, actually it's 10 days later. He says he's going to move to have her admonished. Admittedly, he pulled that from the docket. It was on their docket. So that doesn't count under Colson Pierce, that line of authority. It sets up what's going to happen later. Rambo intentionally walks into her. Uh, the judge called that perhaps a, uh, a battery. Uh, she's then accused and pleadings filed in the public record. And you have to understand, just stick with this, stick with telling me what you alleged was the adverse employment action. Subsequent the next thing in November, this all happened in August and November, all the attorneys got together. They filed pleadings in the public record, accusing her of illegally giving this information away in violation of the winner's decision. That's, that's exactly right. Uh, and you have to understand your, what's the adverse action and what's the case that stands for what you're about to tell me you alleged was the adverse action that amounting to under the law being adverse employment. Let's look at sharp. Okay. So it's sharp. I'd have to go to sharp where she's, she, the judge said, well, she, she voluntarily resigned from the chairman of the committee. That was no more voluntary than, than what happened in sharp. You know, you make someone's life so miserable and they changed all the rules on her. After this happened, she had to get permission to do anything is you're saying it's a constructive demotion, constructive demotion, and which of the defendants here told her she pressured her enough. I thought it was the court administrator. No, it was the court administrator and the chief judge winners went to her and his winners, the defendant. No, no, he's not a defendant. The court administrator is, but that person's subordinate to her. How could he have taken an adverse? He's the chief judge. He called the court administrator. How could, what's the case that would say that person could adversely take an employment action for a judge, the court administrator. Well, he's also, he was running the show, your honor. If you saw this, he was a judge who retired and then he became the court administrator. He's the one who told judge sharp to deny, to quash all the subpoenas. He held a, a much more powerful position than just saying he's the court administrator. The allegations are that they have legal power to, to terminate her from her position as the head of the personnel. No, she's an elected official, your honor. I don't think he, any of these judges had any power to fire her. They could only make her life miserable. They could only give her a constructive demotion. They could only present her in the public as a pariah, someone who's gone outside and caused all kinds of problems. Why doesn't that, I mean, I'm not in any way minimizing arguably according to her complaint, the bravery of someone trying to expose payroll fraud, corruption, rogue law clerk, whatever her allegations are, but it would seem to me that would be an intense amount of acrimony that then the newspapers get a hold of the auditor walks into their lawsuits filed, but it's harder to see how it becomes a 1983 action where we have to identify private citizen speech and we have to identify a cognizable, actionable adverse action. Well, importantly, judge sharp then advises everybody, all the judges and court personnel, he's no longer communicating with her. He's no longer going to tell her when committee meetings are set, he will no longer sit on any committee with her. Right? She's suddenly an outcast. She's not a normal judge. It's ugly. It's outcast, but it's hard to see that as an adverse employment action. That's just where I come back to. You say sharp's your best case, but sharp, our court was very reluctant to describe a transfer as a demotion. That's right. It was a constructive thing. And the point is that the trial judge said, well, she voluntarily resigned her position in sharp. The court says, yeah, we get that, but there's voluntary. And then there's, you made me do it. I had no other choice to do it. That's the position she's in. She's in the same position as sharp. She had to give up one of the most prestigious committee heads. There is all the employees because they just made it where she, she couldn't do that. She, she had no authority. She was not chairman anymore. Why, why do I pretend like I'm chairman when they're, they're just going around still out there. What's still left outside of this federal court proceeding and I, and that, and my question is what inquiry disciplinary professionally media audit anything or is it all Polanski? We're not privy to the judicial sanctions that may or may not have been implemented against the defendants. My client certainly had nothing against her. The main lawsuit that was filed against the law clerk was dismissed based on total immunity. Even though this law clerk is not an attorney is there's no recourse to the bar association, but the judge gave everybody immunity. The second circuit was about to have oral argument when suddenly they decided they only had two judges out of the whole court who would sit on the case rather than hire an ad hoc, the Louisiana Supreme Court sent it to the first circuit. So we had oral argument, what, six months ago in the first circuit. They said that we'll give you an opinion in six weeks. Very bizarre happening where we were called up to the bench, all of us, and we're admonished, you guys need to settle this case. Wait a minute, would you all please? We were very polite. We all settled up to each other. We were very polite. We didn't get a ruling in six weeks. They hadn't had a ruling in what, six months. Now we are told in two weeks we shall appear before the entire first circuit, all 12 judges, which in my 40 years that's never happened, which tells me of the three of them wanted to materially modify the order, the judgment giving immunity. That's speculation. So we're all going to go to Baton Rouge, I think on the 17th, and have an oral argument again and hopefully that will take care of that. What's your cause of action, to use an old-fashioned phrase? The cause of action, basically in that case, is that the law clerk, what would happen, Your Honor, she would go in and she would take documents. I'm submitting documents to a court. My documents don't get to the judge. I get a call from the judge, he gets everybody on the phone, he says, Ward, don't you understand how it works? When you file a motion, you've got to file a memorandum. I said, Your Honor, I'm looking at my stamped copy of the memorandum. I start looking at other documents. He never got it. I hire an attorney. I have an attorney go in and look at the record and tell me what's there and what's not there. He comes back and says, What's your cause of action? I mean, I understand you're up to, I don't know, abuse of process. I don't know, Your Honor. Abuse of process, theft of documents. You don't know. I don't know how to help you. We do have a cause. I understand everybody's irritated, if I'm being polite, with one another and you're not communicating. I've read through this file two or three times and I keep coming away saying, Well, that's all like a bad neighborhood. The judge is not getting along. I can't imagine that happening. Yeah, it's been very difficult. In a collegial environment, you're going to be in disagreements, but I'm having a hard time finding out and sorting out, Okay, you're now going to raise this to a constitutional level in 1983. You're going to come with a First Amendment claim. Then I ask, Where's the speech? Then I ask, Was this speech pursuant to duties? The guard said, I go through the case. I don't see a claim. Well, Your Honor, Garcetti, I think if we look at Lane, Lane was a little more practical to me. It's whether this speech is ordinary or non-ordinary for a judge. I don't think there's any dispute. This was not an ordinary thing to have. Her speech is basically giving the public, because once we got it, we put it into litigation, giving the public the information that was being repressed. That's her speech. The fact that it's in written form doesn't make it any less speech. Now, you can say, Well, was she really a public official, a private or public? At the time, she got a subpoena. She's a citizen. She has to comply with the subpoena. But she got the subpoena as a judge. No, I didn't subpoena to her as a person. I didn't subpoena the court. I didn't subpoena her in her capacity as judge. I sent the subpoena to Sharon Marchman. I got her file. That's all I got. What documents did she have as an individual then? She maintained her own file, Your Honor. And if you look at the complaint, it goes through her own file. They're court records, aren't they? No, no. These are not court records. She went to try to get the court's, the administrator's to have that, because my subpoena was very broad. So what she brought is her record. She has all her notes, a lot of documents about what happened. And as they put it, it was personal. It should have never been done. It was privileged. It wasn't privileged. Now, they had sought, and this was another issue, there was another case where the newspaper filed a suit, too. What do you want out of this court? What do you, what do you, what do you, Your Honor? Your Honor, I think, I think, I think all this court should do, in my opinion, is look at it and say, under the four corners of this amended complaint, it does state a cause of action. Where are you going with this? I mean, I don't, I don't get it. I would hope. What do you want? You're not, some want damages, they want this. What do you want in the real world of this, of this situation? Judge, I, damages, she's been damaged. She has significant attorney fees. She's, her, she ran for election of the Second Circuit Court of Appeals. You seek money. No, it's not really a money thing. No, you, She wants, she wants vindication. You, what, what, She just, No, no, no, no, no, no. Yes, sir. No, no, no, no, no, no. Stay with me, Your Honor. You're answering that we're not animated by money. My question is, what relief do you seek, whatever be the animation? Oh, at the end of the day, I think it should go back, then they'll do their summary judgments, then they'll do a trial. I think at the end of the day, she's been damaged. I think there is no good faith defense that they, I don't think they did it. But at the end of the day, what happens in this case? A judgment's going to be in her doing what? She would get a money judgment. Hopefully she would get some kind of injunctive relief. Injunctive, doing what? Tell him, don't pick on me? What do you mean, injunctive relief? That she's, she, they can't retaliate against her anymore for what she's, she's making speech. Would she want her job back as the chair of the personnel committee? I think she would love to do that as long as everybody goes back to the way it was before. You think that would be a simple thing? We could all sit down and agree to that right now. But the law clerk is still there. It's still a problem. It's still a boiling pot. They've taken no remedial action. So this is not a, this is not a private corporation. No, sir. What you're talking about here is a public office. And that, and that's, and so much of the argument here take, builds off of the types of relief you'd get on the private sector. Yes, sir. Well, and they do have some immunity arguments that they would take up for damages if they're in good faith. And, uh, but if they, if they violated a constitutional right to free speech and they're not in good faith, they do owe damages personally. Are you relying, accepting the Lane-Garcetti framework? Or in order to win, do you have to have reliance on this, I'll mispronounce it, Genovaine? Genovaine is how I say it. No, Judge, I think, you know, it's an interesting question. I think we win on Pickering and Garcetti analysis, all five things we hit. But, but there's one more thing you have to add to the mix. The Genovaine says she's an elected official. She's not just an employee. She has a constituency. Uh, they used this against her in the recent election. They used it against her mightily. That election is coming back up in two years. No one regulated her speech responding to that. In other words, that's right. No, no, they didn't. But the Genovaine may be restricted to that. There can't be sort of formal regulation of a speech. Well, that's why I say there was some, some prior restraint here telling her what she can't say. I think in Genovaine, you basically told the court, look, an elected judge has a right to talk to his constituency. You can't have regulations telling that judge, keep your mouth shut. Well, they did that here. They did that here. And then when she talked, you have, uh, the retaliation under Charles B. Grief. It's a retaliation. That's the main part of this thing. There's prior restraint and then there's retaliation. Thank you, Your Honor. I think I saved a few minutes. Yes, you have some time. Thank you, Mr. Gibson. May it please the court. My name is Jim Gibson. I represent Brian Crawford, who's a Monroe, Louisiana attorney engaged in the private practice of law who was retained to represent, uh, Allison Campbell, another defendant in this case. Mr. Crawford is not alleged to be and has never been a district court judge. He's never alleged in this complaint to have any control over Judge Marchman's employment. And likewise, he's not alleged to have any involvement with any type of adverse employment actions that they claim that she's not a state actor, no color of law. That's not a state actor, Your Honor. He's a private attorney. We cited in our briefs the cases from this court, Glotfleet, Hill, Sparks, all say that when a private attorney is representing a client, even through a legal process, that does not make him or her a state actor. And there's no law that I'm aware of in the federal that would change that. I think the only hiccup was that one case, and I want to say it was up at East Coast, where somebody was in a planted evidence and things like that and called the police there and they held that that might involve a state actor or a constitutional implication. But outside of a crazy case like that, there's nothing. For the court to really appreciate my client's position, and I'm trying to hurry because I'd like to get to some of the things that Mr. Ward said. In fact, let me get to those first to make sure I get that before I get to this. One of the things that Mr. Ward said is that Judge Marchman apparently made a production that goes beyond what's in the record in this court. I will say this, the only time that any of the litigants in this case found that was in a supplemental brief that they argued she did a supplemental subpoena duces tecum return. The only thing in this record is what Judge Marchman said, which we pointed out to your honors, it's on record 512-513, in addition to the judicial administrator asking for records and a letter back. The judicial administrator said she's been instructed not to turn those over. That is the entirety of their speech that their case is based on, based on this record. Again, in a reply memo, they referenced something else that she produced, all these other records. It's not in the record. What's your case that says that responding to a subpoena isn't citizen speech? I would say there's, I've been spent, as you might imagine, the last few days trying to see if any court had decided that. The best that I could find would be the Lane case that we talked about earlier, outlining what is, and then when you go to the other types of courts like cases that deal with sit-ins, things like that, expressive speech where you're not really speaking, we don't have either of those. There's no case that I'm going to turn on a subpoena by an elected official, a public official, or a private citizen is cloaked in First Amendment rights. So I would take the negative. There's none that says that. Lane, I would say... Why don't I take the negative and come to the opposite? Anytime you get a subpoena, no matter who you are, and you show up, that's protected by the First Amendment. Lane stands for that. But you don't necessarily lose, even if that's right. You're saying there is no case that disproves that line of thought, but you think that there also isn't a case that solidly says it. There's no case that solidly says what I've argued here, that it's not protected. You're exactly right, Your Honor. If it is protected speech, then where do we go? If it's protected speech, then we go back to the Garcia case. Was it on a public concern that's the first prong? Right. And keep in mind, her return on the subpoena is not in the Pulaski v. Campbell case. It's in the Pulaski v. Cork shareholder derivative case. And I would just suggest to Your Honors that what public concern does her making this statement with two pages of documents? Well, you know it better. Shareholder. But it sounds like if this, the law clerks at this court are not licensed. Is that true? As far as I know, well, Ms. Campbell is not licensed as an attorney. She's not licensed. She agrees she falsified that sign-in statement, or that's the allegation that she falsified. The allegation is she destroyed documents. She pays $200 to the habeas filings. I mean, it would seem to me, coupled with the absenteeism, you have an issue of public concern. Do you have a rogue law clerk who is highly corrupt and destroying documents? Well, how could you possibly say that isn't something of public concern to expose? In a shareholder civil litigation, Your Honor, where all she's doing is returning two pages of documents, and also keep in mind, in this record in the case, the Louisiana Attorney General declined to prosecute her for anything, that there was no evidence. That's in this record. So, I mean, I understand there are allegations, and we were dealing with the 12b-6, but that's part of what you're doing. I don't think you would shift, just because of time, to saying, well, even if all that were speech, there was no adverse employment action. Oh, no. You relied on Sharpe. Do you have a quick response to Sharpe as not being sufficiently analogous to a constructive demotion? Well, I don't think it's a constructive demotion. It's actually not even what she alleged in her complaint. Her complaint, in paragraph 62, she resigned that, due to concealing existing problems from her in the personnel committee, and avoiding discovering and addressing potential problems. And keep in mind, from my client's perspective, my client first enters the arena in August of 2015. The personnel decision occurs, and she resigns on her own prior to that time. I know I'm past my time, and I'm eating into others. I would love to visit with you more, if you have any other questions. If not, I'll be back. An extra minute. You need another minute or so. Well, Your Honors, I guess the thing that I wanted to at least try to focus on, and I'll try to do this, and I appreciate the Court's indulgence, is when you take the context of this, you start off with that request that was made for these judges to produce Ms. Campbell's personnel file. The Supreme Court appoints a judge to hear that. And in a final ruling that was never appealed, that judge, binding on, I would suggest, the fourth judicial district, holds that these are confidential, that Ms. Campbell is entitled to, under, I guess, I didn't litigate that case, but under whatever rights are provided under her federal and state law, that's confidential to her, and they can't produce it. Then you follow that up with, six weeks later, Mr. Pawlowski, same counsel that Ms. Marchman has, files a lawsuit against Ms. Campbell, and alleges all type of corrupt. That pleading is filled with virtually the same allegations that's in this, as part of the purported misdeeds of Ms. Campbell. Later on, in that, in defending that, my client enters the arena on August 10, 2015, with a motion to strike, arguing that the winner's case precludes those things that they needed to be struck. The response is, a memo by Judge Marchman, in that case, not by Judge Pawlowski, by these lawyers, on 37 occasions in that memo, it says, Judge Marchman will testify about this. My client puts two and two together and says, Judge Marchman is the one that has leaked this information. And we may have learned today that, that, that obviously was the case with what they returned that they didn't put on the record and never provided to us. But, in addition to that, at the hearing on, on that, Mr. Pawlowski in trying to defend against the motion to strike that Crawford has filed against these allegations, Mr. Ward says, when he filed the original pleadings back in July of 2015 for Pawlowski, I've actually had a judge inside the court confirm these things to me or I wouldn't have put them down to start with. So, my position is, from Mr. Crawford's position, I think it probably extends to several other ones, is, he was reasonable in putting together what Mr. Ward has admitted that his client was the one that leaked the information to the, at least to Pawlowski's, information that the judges were bound by under the winner's decision to keep private from Ms. Campbell. And so, in addition to, he's not a state actor, Your Honor, and there's not adverse action, and we believe that the subpoena due susticum doesn't include free speech, we contend that those actions are reasonable, and for all those reasons, as well as what Judge Hicks articulated, we would suggest in a very well-written ruling, we would ask the court, Your Honor, to affirm that decision. And thank you, Your Honor, for the indulgence. Mr. Landry. If you may please the court, I'm Brian Landry, Special Assistant Attorney General for the State of Louisiana, representing Judges Amon, Rambo, Sharp, and Jones, in this matter, who in the name of defendants. It's very interesting in the way that this started, because in looking at it, it really cannot be a First Amendment case because there is no speech. And I think my opponent jumped right on that point, because he realized that that's the weakest part of his case. Producing documents pursuant to subpoena ducus tecum, by itself, without some testimony connected to it, has never been considered a speech in any case that we've seen. The closest you can get is actually the original facts of Garcetti, where the Assistant District Attorney in that case produced a memo, but he was the author of that memo. My colleague is correct. When you look at the record, it was a little bit of a surprise to me today to hear that more was produced to a subpoena ducus tecum than just the two pages, because when you look at the transcript, which the Court had every right to look at under this Court's Dorsey case, because it's clearly referenced directly, and in fact, there are quote marks on complaint paragraph 67 that appear to quote directly from this hearing. So it's no surprise that this hearing transcript could be used under Dorsey. It's very clear there are only two pages of documents that were produced. This is actually shocking today to find out there were not two pages. And when I put the timeline together, it appears that actually some of these documents may have been leaked prior to the subpoena ducus tecum hearing in order for allegations to have been made to even get this case up for a hearing. On the question of timeline, I keep getting confused about this. That subpoena production preceded her resignation or pre- Her resignation predated the subpoena ducus tecum. So would you say It could not be the speech, it could not be retaliation for the speech of the subpoena ducus tecum if you assume the subpoena ducus tecum is speech. Why isn't that the strongest argument? I think that's actually our strongest argument on our side because Rather than getting into the world where there isn't case law saying you come and you say so much about a document production that is or isn't speech, if the only adverse employment action they're pointing to precedes that speech moment. I think that's exactly correct. And not only that, none of the defendants that she named as judges, defendants in this case, had any authority to remove her anyway from this individually. Judge Winters, as chief judge, was in charge of the administrative issues in the court as chief judges are, and he's not even a name defended in this action. And all of the constructive discharge that's being alleged is prior to the subpoena ducus tecum return, which Would you read Genovaine to not require a showing of adverse employment action? I do not read Genovaine to say not just that adverse employment action, but Genovaine stands in a kind of different category to me altogether. Genovaine is really trying to stop an elected official from speaking, actually speaking to their constituency about whatever is important to that elected official and potentially their constituency. It takes a formal, a true formal action that would preclude speech, such as the censor that Judge Higginbotham found in the Genovaine case that the Judicial Commission gave. And Judge Higginbotham and that panel determined that that was going too far. We cannot shut up an elected official from speaking to their constituency. There is nothing here that shows that Judge Morschman was being quieted at all. In fact, Judge Higginson, you related that in questions to earlier today, which was even when she ran for reelection, it became an issue. She was able to speak to it. There was no effort to try to stop her. What we have at the underlying set of this dispute is really, I think you hit it, a court that doesn't get along for a whole lot of reasons. And there's some speech on both sides. If Judge Sharp says, I don't want to serve on any committee with him, I mean, I don't want to serve on a committee with her, well, he doesn't want to serve on a committee with her. I mean, that's just, that's simple. She probably doesn't actually want to serve on a committee with Judge Sharp either if they don't get along that well. So this is an internal court dispute at its heart that is attempting to be ramped up to the level of a constitutional speech claim, seeking damages, injunctive relief, declaratory relief. All of those are being sought. Now, I want to talk for my final minute to talk about one topic that no other attorney is going to talk about, and that's judicial immunity and immunity in general. You got, look at the actions that are alleged to have been done. Sharp, refusing to serve on a committee, the confidential agenda item, which never got brought up, or we may be talking about a different case on retaliation. The Rambo, a bump on an elevator and a stair. Jones, the personnel committee, which he was actually a judicial administrator at the time and had no authority. He was just along with Chief Judge Winter on this. And Amon, who says that he yelled in an ad hoc committee meeting. I would imagine there are probably a lot of raised voices at times in judges' committee meetings on different topics that are discussed. All of those happen within the context of these judges doing their job. Judicial immunity does not mean just what a judge rules upon, but it means that a judge is part of doing that job, whether it's on a committee, whether it is dealing with colleagues in meetings, all of that entitles these judges to judicial immunity. Your Honor, so if you have no other questions for me, thank you for your time. Thank you, Mr. Landry. You speak pretty fast for a Louisiana lawyer. Good morning, Your Honors. My name is Mary Ann White, and I represent former Attorney General James Caldwell on this matter. I'm going to skip over right now, unless you have any questions, the protected speech issue. I think it's been argued by my colleagues, and my briefing shows you that I don't feel like, Mr. Caldwell does not feel like there is protected speech here. I'd like to focus on the lack of actionable harm. And under any framework that's applied here, and I know the framework is at issue, there is no actionable harm, especially for my client, Mr. Caldwell. The allegations against Mr. Caldwell are very, very narrow. We have a very lengthy petition, as I'm sure you're aware, after you reviewed it. And the allegations against Mr. Caldwell are simply that he filed pleadings in a court matter accusing Judge Marchman of disclosing confidential information. The fact that there's no actionable harm speaks to, you know, the personnel committee issue, the fact that Judge Marchman resigned from the personnel committee. That action occurred in July of 2015. The pleadings that were allegedly filed by my client were in November of 2015. So the resignation of the committee chair occurred before the alleged filing of the plea. So you can't even make the connexity there. Also, this court has held on several occasions, Colson v. Graham is one, or Graham is one that is very analogous to my client's position that reputational injury or just criticisms and allegations of illegal conduct are not actionable for First Amendment purposes. And so I would submit to you that that line of cases is in line with what the allegations are here. I also want to talk a little bit about qualified immunity with you. Even if this court were to find in the case, in the allegations against my client, Mr. Caldwell, that there was protected speech, that the response to a subpoena ducis tecum is protected speech, and even if this court were to find in some way that there is actionable harm, I submit to you that my client is entitled to qualified immunity. The allegations obviously show that he was the former attorney general at the time. And because Lane is dissimilar to this case, in Lane there was testimony in response to a subpoena. In this case what we have here is a response to a subpoena ducis tecum. So clearly my client was not put on notice that a response to a subpoena ducis tecum could be considered protected speech. And under a qualified immunity framework, it has to be a violation of clearly established law. Since there is no case for that, I would submit to you that there is qualified immunity. With respect to the actionable harm issue, again the case of Coulson v. Graham and I think Rash Aldridge v. Ramirez is another case that is somewhat similar for my client. In those cases, especially in Coulson, there were investigation memorandums produced by the defendants accusing the plaintiff of illegal conduct. There was even a petition for a recall election submitted and passed around by the defendants in that case. And all that together, that was determined not to be actionable harm. I would submit to you that the filing of pleadings, we have to assume that that is true in this case, the filing of pleadings accusing Judge Marchment of illegal or unethical conduct is far less than those allegations. And so when you look at the state of the law and the circuit, then you look and see that it was not clearly established to be a violation of law, and so there is qualified immunity. With respect to my client, Mr. Caldwell. If there are no questions, then I'm going to reserve the rest of my time for my colleagues. Thank you, Your Honors. Thank you. Mr. Smith? Your time's up. No. Mine starts on orange. I'm Brian Smith. On behalf of the Attorney General's Office, I'm defending that law clerk. Her name is Allison Campbell. She has Received any discipline, and does the record reflect she was disciplined for any of the alleged conduct? There are allegations in the complaint that she was suspended and she was, I think, recused from some cases, and she has had some discipline. The problem is, you know, Judge Marchment obviously did not like Ms. Campbell or her behavior, and she was frustrated because she moved to terminate the law clerk and the judges that the law clerk worked for said she was doing a fine job. She got no second on the motion. She got mad. She quit the committee. Does she have a law license, or is it not uncommon for the law clerk? She has a law degree. I don't believe she's a member of the bar. But she's an employee of the court, and, you know, retaliation is the word of the day, and this is the ultimate distinguishing this internal court information and confidential employment information in PACER and the federal record where it can be disseminated everywhere. It's retaliation. I think, as Judge Hicks said, judicial restraint is very appropriate here, especially when you're talking about personnel matters involving an internal politics of a state district court. And for that reason, you know, we take the position that this is not the proper method for her to seek more redress. She is causing harm to Ms. Campbell by continuing this, and if anybody needs injunctive relief, it's probably Allison Campbell, who is in this case. Because, although she's not a judge, Judge Markman couldn't get her off the payroll, and she became the target of this case. Do you have any questions? Thank you. I appreciate the two minutes. Thank you. I think one more. Mr. Woodley. I'm sorry. Your Honor, I don't really have anything to say. I'm here on behalf of Larry Petit, Joe Morris, for me. Okay. Fine. Thank you. Thank you. I'm outnumbered today. I wanted to clear up something real quick. Mr. Gibson made a point, and this is why we shouldn't go outside the record. They're claiming that Judge Markman leaked information to me or to my co-counsel. That's just false. If you look at the lawsuit that was filed against Campbell in July, it's all matters of public record. I know the Bar Association's investigating those allegations because they came and took my deposition. And then when we got the production in August, we changed the allegations. I wrote a memo in October saying, wow, here's what's happened. That's when they really retaliated. It wasn't she gave me, in fact, she refused to even talk to me about this case before I sent her a subpoena. And the only thing about the subpoena was, hey, will you waive Rule 509 or whatever the rule is requiring you to get advance notice to a judge or a lawyer, 508 and 509. She said, yeah, I don't have any. That's fine. Send the subpoena. I'll take a look at it. I had no discussions with her. My counsel had no discussion with her. It was all private. And to say that she leaked stuff is another thing that they retaliated. They filed pleadings saying that she committed criminal acts, illegal acts, leaking things. She didn't do that. She gave a box of stuff that she had gotten in these investigations. That's her truth about what's going on. She spoke the truth. Here it is. She didn't stand up on the street corner and read these pages one by one. She gave them as documents. I think the law is clear that that should be protected speech. The other comment, I think the law clerk is not a member of the bar. You can't go that route to cure this as I would or the bar investigate any of us. There's a judicial committee that investigates judges, and they're very secretive. I have no idea what happened there. Other than Sharon, nothing happened to her apparently. And I don't know we're even supposed to talk about that. That's very private. The only way I could get anything done was to file suit against the law clerk, and that's on behalf of a different client. That's not Sharon Marchman. That's for separate causes of action. That's not the Marchman deal. These judges are all elected judges. Every judge is elected judge. Any one of these judges, I assume, could go to the local press and tell them everything that they know about this, and the press could report it? Yes, that's true. What happens in all these cases, Pulaski versus Cork, Pulaski versus Campbell, and Marchman versus everybody? What I'm saying to you is that essentially this is occurring in a body that is a political institution that is elected by the voters themselves, and revelations to the voters, and I assume would enjoy some measure of protection. Yes, Your Honor. Accusations by a member of the public that said either one of these things would be protected speech, a newspaper account of all of this would be protected speech. And that was my point, Your Honor. There was a news... Well, but then the only difference here is that this is not a private business when retaliation is over. These are public officials. They can't remove her or anything else, and it's apparently undisputed that this resignation occurred prior to most of this stuff, so... Well, that was merely one thing, Your Honor. One adverse employment action was that, but also all the retaliatory actions against her that we've outlined. I think you have to include all of that. And remember, the initial retaliation where she voluntarily resigned, that's after she kept saying, we've got to go forward. We've got to give this to the press. Remember, the press filed a lawsuit. The press filed a criminal complaint. The press is in every courtroom when we would go. There's always this guy sitting there. They accused me of talking to him. I've never talked to him in my life. I don't get into the personalities of it anymore if we have to, but... Well, I'm just telling you, Your Honor, the press was there. The press was... I'm trying very hard to fit this into any framework of a lawsuit rather than just a... Well, I won't use the text expression for this, but involves boots. Okay. Judge, I think we do have to keep it in the legal framework, and I think we've shown adverse employment retaliation when you combine it all. And I know there's a tendency to say, well, they were just being rude. They were being unprofessional. It was more than that. It really was more than that. Any further questions? Thank you, Your Honor. Thank you all. We'll go ahead and take a short recess to go check up on our...